UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/08/2024
```

-----------------------------------------------------------------------X
                                                    :
SHIXUAN LUO,                                        :
                                                    :
                            Plaintiff,              :
                                                    :            23-cv-5878 (LJL)
            -v-                                     :
                                                    :            OPINION AND ORDER
                                                    :
AIK RENOVATION INC., STEVE NEJASMIC, and            :
MICHAEL RENOSIS,                                    :
                                                    :
                            Defendants.             :
                                                    X
---------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

Defendants AIK Renovation Inc. ("AIK"), Steve Nejasmic ("Nejasmic"), and Michael

Renosis ("Renosis," and together with Nejasmic, "Individual Defendants," and together with

AIK and Nejasmic, "Defendants") move, pursuant to Federal Rule of Civil Procedure 56, for an

order granting them partial summary judgment and dismissing the first, second, fourth, and fifth

causes of action of the Amended Complaint ("AC"). Dkt. No. 32.[1]

For the following reasons, the motion for summary judgment is granted in part and

denied in part.

## BACKGROUND

The following facts are undisputed except where otherwise indicated.

AIK is a company that performs residential and commercial renovations. Dkt. No. 35

¶ 2; Dkt. No. 37-1 ¶ 1. Nejasmic is the principal of AIK and has the power to hire and terminate

---

[1] Defendants do not seek summary judgment on Plaintiff's claims for unpaid wages under the
Fair Labor Standards Act and the New York Labor Law. Dkt. No. 36 at 1, 15.

employees.  Dkt. No. 37-1 ¶ 2; Dkt. No. 37-5 ¶¶ 6, 10; Dkt. No. 34-4 at 8–9.[2]  Nejasmic is an immigrant from Croatia.  Dkt. No. 35 ¶ 4.

Renosis was a project manager at AIK.  Dkt. No. 37-1 ¶ 3; Dkt. No. 34-5 at 2; Dkt. No. 37-8 at 17.  He is white and American.  Dkt. No. 37-12.  Renosis reported to Nejasmic and provided recommendations about employees.  Dkt. No. 37-8 at 22–23; Dkt. No. 34-4 at 4–6.   He would interview carpenters and laborers at the request of Nejasmic.  Dkt. No. 38-9 at 7.  However, Nejasmic states that he makes all final hiring and firing decisions.  Dkt. No. 34-4 at 8–9 ("everybody gets hired and fired by me because nobody is allowed to fire anyone but me").

Plaintiff asserts that Renosis had the right to terminate other people.  Dkt. No. 37-1 ¶ 3.  He states that Renosis fired a carpenter named Cesar Lopez.  *Id.* ¶ 7, Dkt. No. 37-10 at 7, 12.  Renosis states that he never made hiring or firing decisions.  Dkt. No. 34-5 at 4–5.

Plaintiff Shixuan Luo is an Asian male of Chinese national origin.  Dkt. No. 37-1 ¶ 5.  Luo began his employment with Defendants on or about May 31, 2022, after applying for the project manager position on Indeed.com and then interviewing with Nejasmic.  *Id.* ¶¶ 6-7; Dkt. No. 34-2 at 3–4; Dkt. No. 37-3 ¶ 2; Dkt. No. 34-7.[3]

Plaintiff was assigned to be the project manager at the Olympic Tower worksite in Manhattan under the supervision of Renosis.  Dkt. No. 37-3 ¶ 2.[4]  Project managers at AIK are responsible for preparing a full construction schedule of projects from start to finish, managing and supervising AIK employees, scheduling and coordinating all work to be performed by AIK

---

[2] Unless otherwise indicated, citations to documents in this section use ECF pagination.
[3] Plaintiff asserts that his employment began on May 30, 2022, but May 30, 2022, was Memorial Day and the documentary evidence reflects a start date of May 31, 2022.  Dkt. No. 34-7.  The difference is immaterial.
[4] Nejasmic testified that Plaintiff replaced Renosis as project manager, but that Renosis remained on the project to see if Plaintiff was "doing okay."  Dkt. No. 37-8 at 17-18, 21.

labor and subcontractors, coordinating and communicating with project architects, engineers, and/or owners, safety, and engaging in quality control.  Dkt. No. 37-5 ¶ 11; Dkt. No. 37-10 at 9–11.

On or about June 3, 2022, while Plaintiff was working for AIK, Nejasmic asked Plaintiff whether he knew of anyone who might want to work for AIK, Dkt. No. 34-4 at 10; Dkt. No. 34-2 at 15.  Plaintiff stated that he knew of a potential carpenter, sent pictures of his work, and noted that his weakness was knowing little English.  Dkt. No. 34-8.  Nejasmic encouraged Plaintiff to bring the individual in for an interview.  Dkt. No. 37-10 at 22; Dkt. No. 34-8.

The individual was not hired.  The parties dispute the course of events.  Plaintiff testified that Nejasmic wanted Resnosis to interview the potential employee.  Dkt. No. 39-10 at 18; Dkt. No. 37-3 ¶ 11.  When Plaintiff brought the potential employee to the site where both Plaintiff and Resnosis were working, Plaintiff told Renosis that the potential employee was here to interview. Dkt. No. 37-3 ¶ 11.  Renosis ignored Plaintiff and made the potential employee wait for an hour and a half[5] and then, after Renosis asked Plaintiff whether the potential employee was "good," and Plaintiff responded that the worker was good, Renosis stated: "Who fucking can compete

---

[5] Plaintiff's deposition states "half an hour," Dkt. No. 37-10 at 20, but Plaintiff's errata sheet revises this to one and a half hours, Dkt. No. 37-11 at 9.  Plaintiff's declaration states "one and a half hours."  Dkt. No. 37-3 ¶ 11.  Defendants suggest that Plaintiff attempts to "misuse the errata sheet."  Dkt. No. 38 at 2.  Federal Rule of Civil Procedure 30(e) allows a deponent to make changes to his deposition "in form or substance," and does not "require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes."  *Podell v. Citicorp Diners Club, Inc*., 112 F.3d 98, 103 (2d Cir. 1997) (quoting Fed. R. Civ. P. 30(e)); *see Samad Bros., Inc. v. Bokara Rug Co*., 2012 WL 43613, at *8 (S.D.N.Y. Jan. 9, 2012) ("Courts in the Second Circuit construe Rule 30(e) broadly, permitting any changes to the deposition to be considered as part of the record, even where they contradict the original answers.").  However, "[t]he original answer to the deposition questions will remain part of the record and can be read at the trial."  *Podell*, 112 F.3d at 103 (quoting *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D.Ill.1981)).

with the fucking Chinese?"[6] and went back to the other room without interviewing the worker. Dkt. No. 37-2 ¶ 11; Dkt. No. 37-10 at 20–21.

Nejasmic and Resnosis deny that Resnosis was to interview the potential employee.  Dkt. No. 34-4 at 10–11; Dkt. No. 37-8 at 23; Dkt. No. 37-9 at 10–11.  Rather, Nejasmic interviewed the potential employee.  Dkt. No. 34-4 at 10–11.  When the potential employee asked to be paid in cash, Nejasmic refused and the interview came to an end.  *Id.*; Dkt. No. 37-8 at 22.  Plaintiff does not recall hearing Renosis make any other statements about persons of Chinese nationality or origin.  Dkt. No. 34-2 at 32.   The alleged statement by Renosis was the only statement that Plaintiff personally heard anyone at AIK make about persons of Chinese nationality.  *Id.* at 32–33.

Plaintiff also testified that during the course of his employment, an employee named Juan reported to him that another employee, a field operation manager named Wojciech, had asked Juan "do you want to work with a Sino or work with Michael?"  Dkt. No. 37-1 ¶ 8; Dkt. No. 37-10 at 26.   Plaintiff himself did not witness the statement.  There is no testimony from Juan or from Wojciech that Wojciech ever made the statement.   Plaintiff did not mention the incident to either Nejasmic or to Renosis.  Dkt. No. 37-10 at 27.

Plaintiff also testified that Nejasmic made what Plaintiff characterized as a racist joke by mimicking the way in which a Black employee, Jaycon, chewed and ate his food.  Dkt. No. 37-10 at 23–24; Dkt. No. 37-3 at ¶ 8.  Plaintiff stated that he heard the "N" word used in the workplace, although his testimony was not clear as to who used the word.  Dkt. No. 37-10 at 24–25.  Plaintiff could not recall any other racial slurs or racist comments or jokes being made at

---

[6] The transcript of Plaintiff's deposition gives this statement as "who fucking can communicate fucking in Chinese?"  Dkt. No. 37-10 at 36.  Plaintiff's errata sheet states that "compete with fucking" was erroneously transcribed as "communicate fucking in."  Dkt. No. 37-11 at 14.

AIK.  Dkt. No. 37-10 at 27.  Plaintiff testified affirmatively that Nejasmic never made any sort of a racial slur or comment directed toward him individually or any racial slur or comment directed towards persons of Chinese nationality or origin.  Dkt. No. 37-10 at 34–35.

When Plaintiff was working as project manager at the Olympic Tower, he did not communicate with the architect on the project.  Dkt. No. 37-10 at 15–17.  Plaintiff states that he needed to communicate with the architect as part of the construction work and that Defendants intentionally excluded him from such communication.  *Id.*  Nejasmic testified that Renosis was communicating with the architect because Plaintiff was new, and that it was standard procedure to ease new hires into the project until Nejasmic was sure that they were capable.  Dkt. No. 37-8 at 50–52.  There is no evidence that other project managers were permitted to meet with architects during their first month of work at AIK.  Dkt. No. 37-10 at 17.

Plaintiff states that his supervisors withheld supplies and labor.  Dkt. No. 37-3 ¶ 10. Plaintiff acknowledges that on June 22, 2022, he requested materials at 3:44 PM and was told it was too late in the day to request materials.  Dkt. No. 37-10 at 13–15; *see* Dkt. No. 37-9 at 16– 19.  Plaintiff did not ascribe the reason the materials were not provided to his race or ethnicity. Dkt. No. 37-10 at 31–32.

On or about June 15, 2022, while Plaintiff was the project manager, an employee other than Plaintiff called Nejasmic to the Olympic Tower and expressed the concern that Jaycon was under the influence of alcohol or illegal drugs.  Dkt. No. 37-8 at 25–28.  According to Nejasmic, Plaintiff had sent Nejasmic an email that "Jaycon was not performing," but did not mention "that something was wrong with him."  *Id.* at 27, 32–33.  When Nejasmic arrived at the worksite, he observed that Jaycon was under the influence and had concerns about the safety of Jaycon and

others.  *Id.* at 25–28.  Nejasmic sent Jaycon home and terminated his employment.  *Id.* at 27.

Plaintiff never observed Jaycon to be under influence of drugs or narcotics.  Dkt. No. 37-10 at 9.

Plaintiff's last day at AIK was July 8, 2022.  Dkt. No. 37-4; Dkt. No. 37-3 ¶ 4.  Plaintiff

produced a recording of a conversation between Plaintiff and Nejasmic in which Nejasmic told

Plaintiff he was being reassigned or fired.  *See* Dkt. No. 34 ¶ 10; Dkt. No. 37-2 ¶ 5.[7]  The

recording is approximately 45 minutes long.  In the recording, Nejasmic states that Plaintiff has

made too many mistakes for a high-end residential project, specifically referencing issues with

the ductwork, problems getting power to the center of the apartment, and a misplaced pocket

door.  Rec. 2:15–2:35.  Plaintiff states that he reported all of these issues but Nejasmic never

responded to his emails.  *Id.* 2:50–3:50.  He states that Renosis told him not to call Nejasmic.  *Id.*

at 11:30–11:40.  Plaintiff also states that Renosis did not let him communicate with the architect

or building to fix the issues, and all communications had to go through Renosis.  *Id.* at 6:00–

6:15, 8:10–8:25.

Nejasmic responds that the point is that he needs somebody who knows high-end

residential, and that because of what he has seen he does not trust Plaintiff on that type of job.

*Id.* at 9:00–10:40.  He would trust Plaintiff with commercial construction but he cannot run the

risk of having him on high-end residential work, where clients are demanding and a higher

standard is expected, when Plaintiff is not bringing issues to his attention.  *Id.* at 9:00–10:40,

13:00–14:30.  Nejasmic cannot be going through the project himself day by day, and needs

someone who understands high-end residential.  *Id.* at 14:45–17:30.  He states that the issues

---

[7] The recording could not be uploaded on the docket and therefore has no docket number.  It is cited here as "Rec."  The version of the recording used is the version submitted by Plaintiff as Exhibit D to counsel's declaration at Dkt. No. 37-2.  The version submitted by Defendants appears to be identical.

with the height of the ceiling and power are very important details that no one picked up, not Plaintiff or Renosis, until Nejasmic saw them yesterday. *Id.* at 19:20–20:30. A project manager should be able to look at the drawings and see things that will be problems, and bring them to Nejasmic's attention. *Id.* at 27:40–29:00. The project manager needs to be detail oriented and ahead of everyone. *Id.* at 27:40–29:00, 35:50–37:45. Nejasmic repeats several times that he is stressed because of repeated mistakes on his projects and the importance of the high-end residential client. *Id.* at 13:00–14:30, 17:30–18:00, 24:00–27:00.

Regarding Plaintiff's explanation that he reported the issues by email and Renosis limited his other communication, Nejasmic states that "you have to call me" and that the email reports are not sufficient to bring issues to his attention. *Id.* at 12:15–13:30, 24:00, 27:00–27:30. He says he told everyone that if they need him, they have to call him. *Id.* at 32:47. He does not check email and only uses it as "evidence in case something happens." *Id.* at 11:30–12:30. He cannot have new project managers in meetings to communicate with the architect, *id.* at 38:10–39:30, and needs to be alerted to the issues so he can raise them in meetings with the architect, *id.* at 14:45–15:20. He emphasizes several times that it does not matter if the issues are Plaintiff's fault or Renosis's fault, because either way it is creating a problem for Nejasmic. *Id.* at 15:15–17:30, 19:50–20:00.

At the end of the conversation, Nejasmic states that he is replacing Plaintiff with someone who he knows from a previous job who used to run high-end residential. *Id.* at 43:00–43:50. He states that Renosis cannot do high-end residential, and he thought Plaintiff could but not after seeing so many mistakes. *Id.* Plaintiff states that the new employee told him the new employee does not have experience with electricity and ductwork. *Id.* at 43:50–44:30. Nejasmic responds that he knows the employee ran another high-end residential project, but if it turns out

he is not good he will be removed quickly and Nejasmic himself will have to take the project. *Id.* at 44:30–45:00.  Nejasmic tells Plaintiff that on that day, he should go to the 40th Street project.  *Id.* at 43:00.   Plaintiff asks if he should look for a new job, and Nejasmic says that they should discuss it later that day, because he might have more commercial projects or other apartments he can put Plaintiff on.  *Id.* at 45:00–47:00.  The recording does not mention the incident with Jaycon or any safety issues.

Nejasmic's deposition testimony differs from his statements in the recording.[8]  When asked about Plaintiff's firing in his deposition, Nejasmic focused on the incident with Jaycon. Nejasmic testified that it was the responsibility of the project manager to be concerned about safety, and that Plaintiff had failed in that responsibility because Nejasmic had to learn about Jaycon's condition from another employee.  Dkt. No. 37-8 at 29–30, 32–33.  Nejasmic testified that he told Plaintiff a few days after the Jaycon incident that his employment was being terminated because of "this unsafety at the job site," and also mentioned other mistakes.  Dkt. No. 37-8 at 35, 42–45, 60–62.  When asked at deposition whether he had any other reason to lay off Plaintiff, Nejasmic testified: "No.  Here and there some little, small mistakes, but not enough for the firing reason that I going to fire him, but for me, safety is number one on a job, especially for the PM."  Dkt. No. 37-8 at 33–34, 53; *see* Dkt. No. 35 ¶ 6.  Nejasmic testified that after he told Plaintiff he was being terminated, he reassigned him to Heritage Bakery for two weeks to give him time to find a job.  Dkt. No. 37-8 at 35–36, 42–43.

Plaintiff states that he continued working at the Olympic Tower worksite until July 7, 2022, and "never worked at the bakery worksite for two weeks."  Dkt. No. 37-3 ¶ 3.  Emails and

---

[8] Plaintiff did not produce the recording until after Nejasmic's deposition.  *See* Dkt. No. 38 at 3. Defendants state that Plaintiff "should not be able to benefit from his apparent litigation gamesmanship," but do not seek sanctions or any other form of relief.  *Id.*

texts show Plaintiff communicating with Renosis, Nejasmic, and others at AIK regarding specific aspects of the Olympic Tower project between June 15 and July 5, 2022, the time in which according to Nejasmic's deposition testimony he had been reassigned to the bakery.  Dkt. Nos. 37-6, 37-7.   This evidence is consistent with the recording provided by Plaintiff.

Nejasmic states that Renosis played no role in Plaintiff's termination.  Dkt. No. 37-8 at 34.  Plaintiff testified that he did not know whether Resnosis was involved in the decision to fire him.  Dkt. No. 37-10 at 11–12.

Plaintiff was replaced with a white, "Moldovian/American," male employee who as of January 2024 remained employed with AIK.  Dkt. No. 37-5 ¶ 9.  A list of project managers at AIK since 2017 lists the race of seven as "White," the race of one as "African American/Black," and two with no race listed but ethnicity described as "Polish/American" and "Ukraine/American."  Dkt. No. 37-12.  A list of employees laid off by AIK between July 2021 and July 2022 lists the race of nine as White, fifteen as Hispanic, two as Black, and one (Plaintiff) as Asian.  Dkt. No. 37-4.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint filed on July 10, 2023.  Dkt. No. 1.  Plaintiff filed the AC on July 13, 2023.  Dkt. No. 3.  The AC alleged seven causes of action: (1) race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (2) hostile work environment in violation of Title VII; (3) retaliation in violation of Title VII; (4) race and national origin discrimination in violation of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"); (5) hostile work environment in violation of the NYSHRL and NYCHRL; (6) retaliation in violation of the NYSHRL and NYCHRL; (7) unpaid salary violation based on the Fair Labor Standards Act

("FLSA"), New York State Labor Law ("NYLL"), Wage Theft Protection Act ("WTRA"), and other local administrative regulations.  Dkt. No. 3.

On August 25, 2023, Defendants filed a motion to dismiss the first, second, third, fourth, fifth and sixth causes of action.  Dkt. No. 7.  The Court issued a Memorandum and Order resolving that motion on November 22, 2023.  Dkt. No. 20.  The Court sustained Plaintiff's claims for disparate treatment and hostile work environment under Title VII, the NYSHRL, and the NYCHRL.  *Id.* at 7–11.  The Court granted Defendants' motion to dismiss Plaintiff's claims for retaliation under federal, state, and city law.  *Id.* at 11–13.

On August 9, 2024, Defendants filed this motion for summary judgment on Plaintiff's first, second, fourth, and fifth causes of action.  Dkt. No. 32.  Defendants supported the motion with a memorandum of law, a Local Rule 56.1 statement, the declaration of counsel, and the declaration of Nejasmic.  Dkt. Nos. 33–36.  Plaintiff filed a memorandum of law in opposition to the motion on August 23, 2024, along with a Local Rule 56.1 statement, an affidavit of counsel, and an affidavit of Plaintiff.  Dkt. No. 37.  Defendants filed a reply memorandum of law in further support of their motion on September 6, 2024.  Dkt. No. 38.

**LEGAL STANDARD**

**I.     Summary Judgment Standards**

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

10

there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

Thus, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-moving party thus cannot "rely on conclusory allegations or unsubstantiated speculation," *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)), or "defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright*, 554 F.3d at 266.  That is, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Moreover, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit

evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009); *see Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). However, because the "salutary purposes" of summary judgment apply with equal force in the employment context, *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), it "remains available . . . in cases lacking genuine issues of material fact," *Agostinello v. Great Neck Union Free Sch. Dist.*, 353 F. App'x 589, 590 (2d Cir. 2009) (summary order) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994)). Indeed, the Supreme Court has instructed that courts are not to treat discrimination any "differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

## DISCUSSION

Defendants move for summary judgment on two types of claims: discriminatory termination and hostile work environment. Dkt. No. 36. Both types of claims are brought under federal, state, and local law. *See* Dkt. No. 34-1.

## I.    Claims of Discriminatory Termination

Claims of adverse action employment discrimination under Title VII and the NYSHRL are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, to establish a prima facie case, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took

12

place under circumstances giving rise to an inference of discrimination. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).  In employment discrimination cases, the burden of establishing a prima facia case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).  If the plaintiff meets his burden at the first step, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination." *Ruiz*, 609 F.3d at 492.  The burden is "one of production, not persuasion." *Reeves*, 530 U.S. at 142 (2000).  If the defendant meets its burden, the presumption of animus drops away and "the burden returns to the plaintiff to show that the real reason for [the adverse action] was his [protected status]." *Ruiz*, 609 F.3d at 492.

"[W]hile a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the employer's proffered reason." *Bart v. Golub Corp.*, 2024 WL 1281069, at *4 (2d Cir. Mar. 26, 2024) (emphasis in original). Rather, a plaintiff can also "prevail by proving that an impermissible factor was a *motivating factor*, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Id.*  (quoting *Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)).  At this stage, "'the evidence establishing the plaintiff's prima facie case' remains relevant, *Reeves*, 530 U.S. at 143, but the mere fact that a prima facie case had been found would not." *Weaver v. Bloomberg L.P.*, 2024 WL 693166, at *8 (S.D.N.Y. Feb. 20, 2024).

The parties contest whether Plaintiff has made a prima facie case that his firing took place under circumstances giving rise to an inference of discrimination. Dkt. No. 36 at 6–7; Dkt. No. 37 at 13–14. However, on a motion for summary judgment, an emphasis on the prima facie case is "usually misplaced." *Weaver*, 2024 WL 693166, at *8 (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.). The relevant question on a motion for summary judgment is whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. And in employment discrimination cases, the question answered by the jury is not whether the plaintiff has made out a prima facie case, *see* Leonard B. Sand et al., 5 Modern Federal Jury Instructions 88-139 (2019 ed.) (citing *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998)), but only "the ultimate question: has the plaintiff proved that it is more likely than not that he or she was subjected to the adverse employment action based on an illegal discriminatory motive?" *See Greenway*, 143 F.3d at 53. Thus, on a motion for summary judgment "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'" *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715 (1983) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Accordingly, "'an increasing number of courts in th[e] [Second] Circuit presume that plaintiffs have sufficiently presented a prima facie case,' and examine Defendants' nondiscriminatory reason for termination, considering these arguments at the third step of the McDonnell Douglas framework." *Osinoff v. Nuvance Health*, 2024 WL 967190, at *9 (S.D.N.Y. Mar. 5, 2024) (quoting *Hernandez v. Off. of Comm'r of Baseball*, 2021 WL 1226499, at *5 (S.D.N.Y. Mar. 31, 2021)). If, after considering all of the evidence, a court

is left with the view that a reasonable jury could find that the defendant has intentionally discriminated, it has not hesitated to deny a motion for summary judgment. *Weaver*, 2024 WL 693166, at *14. If, by contrast, no issues of fact remain after considering the employer's legitimate nondiscriminatory reason for the adverse employment action, then courts also have not hesitated to grant summary judgment notwithstanding plaintiff's prima facie case. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170–71 (2d Cir. 2001); *Osinoff*, 2024 WL 967190, at *14; *Hernandez*, 2021 WL 1226499, at *10; *Gorley v. Metro-North Commuter R.R.*, 2000 WL 1876909, at *7–8 (S.D.N.Y. Dec. 22, 2000).

The Court assumes that Plaintiff has made out a prima facie case. Plaintiff was replaced by a person who was not in the same protected class as he. *See Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage."); *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 382 (2d Cir. 2001); *de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996).[9]

---

[9] In an unpublished summary order, the Second Circuit has stated that "although an inference of discrimination may arise when an employer replaces a terminated employee with an individual outside the employee's protected class," whether this is so depends on "the particular circumstances of the case" and that the inference may be "undercut" by other allegations in the complaint. *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F. App'x 39, 42 (2d Cir. 2017) (summary order). Subsequently, a number of courts in this Circuit have held that no inference of discrimination arises where, for example, plaintiff was one of a number of employees all of whom were terminated, *see, e.g.*, *Wu v. Good Samaritan Hosp. Med. Ctr.*, 2019 WL 2754865, at *4 (E.D.N.Y. July 2, 2019) (defendant terminated the employment of all physicians providing the services provided by plaintiff), *aff'd*, 815 F. App'x 575 (2d Cir. 2020), or where, for example, defendant had a preexisting relationship with the replacement, the replacement and the plaintiff were not similarly situated in all material respects, and the defendant was entitled to the same actor inference, *see Mansaray v. Kraus Sec. Sys.*, 2021 WL 183275, at *4 (S.D.N.Y. Jan. 19, 2021). *But see Beverley v. N.Y.C Health & Hosps. Corp.*, 2022 WL 873251, at *7 & n.9 (S.D.N.Y. Mar. 23, 2022) (holding that the mere fact that Plaintiff was replaced by a younger white male employee was sufficient to support a minimal inference of

Defendants also have satisfied their burden of production to assert legitimate reasons for Plaintiff's termination.  Poor performance is a legitimate non-discriminatory reason for an adverse employment action.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014); *Osinoff*, 2024 WL 967290, at *9 (citing cases).[10]

Plaintiff has proffered sufficient evidence from which a reasonable jury could find that the reasons for his termination were pretextual.  The reasons Nejasmic articulates in his deposition for firing Plaintiff conflict with the reasons he provided to Plaintiff at the time.  The stated reasons for Plaintiff's termination given to him at the time, as reflected in the contemporaneous recording, relate to his performance on a high-end residential project and his capacity to act as a contractor on such projects.  Nejasmic lists a variety of problems with Plaintiff's work and communication style, and asserts that Plaintiff is not able to adequately perform high-end residential work.  *See* Rec. 2:15–2:35, 12:15–14:30, 14:45–15:20, 19:20–20:30, 27:00–29:00, 35:50–37:45, 43:00–43:50.  A jury could readily find, from Nejasmic's own words, that the reasons given to Plaintiff for the termination of his employment were not the real reasons for that action. In his deposition, Nejasmic admitted that although Plaintiff made "little,

---

discrimination, and distinguishing the cases cited above).  Here, Defendants have not offered evidence that would undercut the probative value of the race of Plaintiff's replacement.

[10] Plaintiff asserts that Defendants do not provide specific evidence to support this reason for termination, Dkt. No. 37 at 14–15.  However, Defendants' statement of material facts cites to the recording, *see* Dkt. No. 33 ¶ 19, in which Nejasmic describes a number of specific issues with Plaintiff's performance.  Plaintiff suggests that Defendants have not provided evidence that Plaintiff's performance was actually deficient.  *See* Dkt. No. 37 at 16.  But "the issue to be proven in a discrimination case is whether there was an improper motive for the employment decision—not whether any conduct relied upon by the employer actually occurred."  *Oluyomi v. Napolitano*, 811 F. Supp. 2d 926 (S.D.N.Y. 2011), *aff'd*, 481 F. App'x 693 (2d Cir. 2012).  Defendants have provided evidence that Nejasmic fired Plaintiff because he perceived a number of specific deficiencies in Plaintiff's work, regardless of whether these errors actually occurred or were Plaintiff's fault.  This is sufficient to carry Defendants' burden to provide a legitimate nondiscriminatory reason for Plaintiff's firing.

small mistakes," these mistakes were not the reason for his termination and would not have justified firing him. Dkt. No. 37-8 at 33–34, 53. A jury could find that such evidence undermines the contemporaneous stated reason for the termination of Plaintiff's employment.

At his deposition, Nejasmic gave a different reason for the adverse employment action. He ascribed the action to concerns about safety, rather than performance. Specifically, after the Jaycon incident, which was on June 15, Nejasmic concluded that he could not trust Plaintiff to run a safe workplace. Dkt. No. 37-8 at 29–30, 32–33. It was the Jaycon incident and Plaintiff's inability to recognize and failure to report that Jaycon was under the influence of alcohol or drugs that was the precipitating reason for the termination. *Id.* at 35, 42–45, 60–62. As soon as Nejasmic discovered that Jaycon was at the Olympic Tower under the influence, he immediately told Plaintiff he would be fired and reassigned him for two weeks to give him time to find a job. Dkt. No. 37-8 at 35–36, 42–43. But a reasonable jury could find that the incident with Jaycon was not the true reason for Plaintiff's termination. Nejasmic did not mention anything about Jaycon on the recording. There is no evidence other than Nejasmic's post-hoc say-so that the incident with Jaycon had anything to do with Plaintiff's termination. *See Sklaver v. Casso-Solar Corp.*, 2004 WL 1381264, at *9 (S.D.N.Y. May 15, 2004) ("[E]xplanations created after an employee's termination are 'suspect.'" (quoting *George v. Mobil Oil Corp.*, 739 F. Supp. 1577, 1583 (S.D.N.Y. 1990))). For approximately three weeks after Jaycon's firing, Plaintiff continued to work at the Olympic Tower site, despite his supervision purportedly creating a serious safety issue. *See* Dkt. Nos. 37-6, 37-7.

A jury could find from these "shifting and somewhat inconsistent explanations" that neither reason for Plaintiff's termination was genuine and that Plaintiff was terminated for reasons other than either safety or performance. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d

834, 846 (2d Cir. 2013).  When the employer gives two "fundamentally different justifications" for an action, this suggests "the possibility that neither of the official reasons was the true reason."  *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993), *as amended on denial of reh'g* (Jan. 26, 1994).

In *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, the Supreme Court considered the question whether prima facie evidence of discrimination under the *McDonnell-Douglas* test plus evidence that the defendant's stated reason for the adverse employment action was pretextual could be sufficient to sustain a claim of intentional discrimination, or whether something more was required.  The Court's answer was that it depends.  "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Id.* at 147.  It is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'"  *Id.* (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).  "[T]he employer is in the best position to put forth the actual reason for its decision."  *Id.*  Thus, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," and "once the employer's justification has been eliminated discrimination may well be the most likely alternative explanation" for the employer's adverse employment action.  *Id.*

At the same time, however, evidence of pretext does not invariably permit a conclusion of discrimination.   "[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff."  *Id.* at 146.  The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that

the plaintiff's proffered reason . . . is correct.'" *Id.* (quoting *Hicks*, 509 U.S. at 524). Thus, the Supreme Court made clear "there will be instances where, although plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.* at 148. The court must consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered" on a motion for summary judgment. *Id.* at 148–49.[11] "[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148.

"[T]he Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 143). "[I]in some circumstances the prima facie case and/or evidence of falsity might give powerful evidence of discrimination—more than enough to sustain a plaintiff's verdict—but in others, the two together might fall far short of providing evidence from which a reasonable inference of discrimination could be drawn." *James v. N.Y. Racing Ass'n*, 233 F.3d

---

[11] The Supreme Court identified the factors that the court must consider on a motion for judgment as a matter of law. The standard is identical on a motion for summary judgment. *See Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004); *Nadel v. Isaksson*, 321 F.3d 266, 272 (2d Cir. 2003).

149, 154 (2d Cir. 2000).  Thus, for example, a defendant is entitled to summary judgment where the only evidence of discrimination is that the terminated plaintiff is replaced by a person "whose membership in protected classes is not identical to plaintiff's," there are no remarks or surrounding evidence suggesting discrimination, and plaintiff's evidence of pretext is weak.  *Id.* at 155 n.1;[12] *see also Schnabel*, 232 F.3d at 91; *Chen v. Stony Brook Univ. Advancement*, 2022 WL 289317, at *2 (2d Cir. Feb. 1, 2022); *Campo v. Slater*, 128 F. App'x 173, 175 (2d Cir. 2005).  On the other hand, when there are derogatory remarks or other evidence suggestive of discrimination by the decision-maker beyond the mere fact of plaintiff's replacement, this may present an issue of fact for the jury.  *See Reeves*, 530 U.S. at 151–52; *Walsh*, 828 F.3d at 77–80; *Weiss v. JPMorgan Chase & Co*., 332 F. App'x 659, 662–63 (2d Cir. 2009) (summary order); *Gordon*, 2018 WL 4681615, at *10–12; *Teachey v. Equinox Holdings Inc*., 2022 WL 1125279, at *11 (S.D.N.Y. Apr. 14, 2022).

As discussed *supra*, Plaintiff's evidence that Nejasmic's stated reasons for Plaintiff's termination were not his real reasons is strong.  A jury could find that Nejasmic lied when he told Plaintiff he was being terminated for performance reasons and it could also find that the reasons offered after Defendants were sued were contradicted by Defendants' contemporaneous actions.

---

[12] In *James*, the court offered the hypothetical where the employer stated that "the plaintiff was fired for speaking in insubordinate terms to a supervisor," but the plaintiff "denie[d] having used the offensive language."  *Id.* at 155 n.1.  Arguably, in such a case, the plaintiff's evidence would not even demonstrate pretext.  *See McPherson v. N.Y.C. Dep't of Educ*., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what 'motivated the employer.'" (quoting *Aikens*, 460 U.S. at 716)); *Brady*, 520 F.3d at 496 ("[T]he question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether the employer honestly and reasonably believed that the underlying sexual harassment incident occurred.").

Plaintiff's prima facie evidence of discrimination, by contrast, is not particularly strong. Plaintiff was an Asian and Chinese employee who was fired and replaced by a white employee Dkt. No. 33 ¶ 5; Dkt. No. 37-5 ¶ 9.  Nejasmic had purportedly worked with the replacement employee on a previous project.  Rec. 43:00–45:00.  However, when Plaintiff confronted Nejasmic on the recording with the fact that the replacement had no experience with electricity and ductwork, areas in which Plaintiff had supposedly been deficient, Nejasmic did not refute Plaintiff's claim but merely stated that, if so, the replacement also would be fired.  44:30–45:00. This suggests, at the least, that Nejasmic did not verify that Plaintiff's replacement would have the skills that Plaintiff supposedly lacked.  Moreover, there is evidence that Plaintiff was the only Asian American ever employed by AIK in any role.  Dkt. No. 37-3 ¶ 2.  Plaintiff attempted to introduce a Chinese employee to the company, but that employee was not hired.  Dkt. No. 37-3 ¶ 11, Dkt. No. 34-4 at 10–11.  AIK's project managers were almost all white employees who, like Nejasmic, had an Eastern European ethnic background.  Dkt. No. 37-12.  AIK had one Black project manager between 2017 and 2023, but that person was employed for only three days in 2023 after Plaintiff's employment was terminated.  *Id.*  Such evidence is properly considered "as one component of [the Court's] cumulative inquiry." *Walsh v. N.Y.C.H.A.*, 828 F.3d 70, 77 (2d Cir. 2016); *see Gordon v. City of New York*, 2018 WL 4681615, at *12 (S.D.N.Y. Sept. 28, 2018) (while "statistics *alone* are insufficient to support a disparate treatment claim," they may be used as another 'individual evidentiary brick[]' supporting an inference of discriminatory animus" (quoting *Walsh*, 828 F.3d at 76)).

On the other hand, Nejasmic, who fired Plaintiff, had hired him only months before while aware of his ethnic background.  "When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious

motivation that would be inconsistent with the decision to hire.'"  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137–38 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997)); *see Schnabel*, 232 F.3d at 91.  This is particularly true "where the termination occurs within a relatively short time after the hiring."  *Carlton*, 202 F.3d at 137.

There is also little or no relevant evidence of any discriminatory remarks.  Plaintiff mentions two derogatory remarks about Asian or Chinese employees.  One is Renosis's comment with respect to the potential employee Plaintiff introduced to AIK, and the other is the comment attributed to the field operation manager Wojciech by another employee named Juan.  Dkt. No. 37 at 13–14.  However, there is no genuine dispute that only Nejasmic, not Renosis or Wojciech, made the decision to fire Plaintiff.  Dkt. No. 34-4 at 8–9; Dkt. No. 34-5 at 4–5; Dkt. No. 37-8 at 34.[13]  "[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."  *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007); *see Brown v. Cnty. of Erie*, 2013 WL 885993, at *7 (W.D.N.Y. Mar. 8, 2013) ("Courts have routinely held that stray remarks by non-decision makers are insufficient, without other evidence, to raise an inference of discrimination.").  Tellingly, Plaintiff identifies no discriminatory comments by Nejasmic.  Dkt. No. 37-10 at 34–

---

[13] Plaintiff asserts that Resnosis was able to influence Nejasmic's decision to fire Plaintiff.  Dkt. No. 37-1 ¶ 2.  His only support for that claim, however, is a conclusory assertion in his declaration that Resnosis was able to influence Nejasmic's decision to fire him.  Dkt. No. 37-3 ¶ 5.  *See Wyatt v. Zuckerman*, 240 F. App'x 885, 887 (2d Cir. 2007) (holding that "conclusory and self-serving statements" were insufficient to create a genuine issue of material fact).  Although Plaintiff has identified evidence suggestive that Resnosis may have had a role in other employment decisions made by AIK, Dkt. No. 37-1 ¶ 2, there is no evidence that he played any role in this case.  Nejasmic and Renosis testify that Renosis was not involved in the decision, Dkt. No. 37-8 at 34; Dkt. No. 34-5 at 4–5, and Plaintiff testifies that he did not know whether Renosis fired him, Dkt. No. 37-10 at 12.

35.  Plaintiff also has identified no evidence that would suggest that Resnosis had any influence on Nejasmic's decision to terminate Plaintiff's employment.  *Cf. Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019) (noting that under the cat's paw theory of liability, when an employee "manipulates an employer into acting as a mere conduit . . . the employees intent can be imputed to the employer." (quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272, 274–75 (2d Cir. 2016)).[14]  As to Plaintiff's testimony about what Juan told him that Wojciech had stated to Juan, that evidence is not supported by any evidence from Juan or Wojciech themselves and thus is inadmissible hearsay for the proposition that Wojciech actually made that statement.  *See* Fed. R. Civ. P. 801(c); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013).  Accordingly, it is not properly considered on this motion for summary judgment. *See Gerzhgorin v. Selfhelp Cmty. Servs., Inc.*, 2023 WL 2469824, at *2 (2d Cir. Mar. 13, 2023).

Courts have permitted cases to survive summary judgment and to go forward where, as here, the evidence of discriminatory intent is not particularly strong, but the evidence of pretext is strong.  In *Zimmermann*, for example, the Second Circuit held that a plaintiff's "slight" numerical evidence of discrimination, combined with "extremely substantial" evidence that the employer's explanation of poor performance was a pretext, was sufficient to allow a jury to draw an inference of sex discrimination.  251 F.3d at 382–83.  Similarly in *Zann Kwan*, a retaliation case, the court held that mere temporal proximity between the complaint and the adverse action, combined with the employers "inconsistent" and at some points "directly contradict[ory]"

---

[14] The cat's paw theory "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner, J.).  The metaphor comes from an Aesop fable "in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction," tricking the cat into burning its paw for the monkey's gain.  *Vasquez*, 835 F.3d at 271–72.

explanations for her termination, were sufficient for a jury to infer retaliation.  737 F.3d at 846–47.

Although the question is close, the absence of discriminatory comments by Nejasmic and the same-actor inference are not sufficient as a matter of law to deny Plaintiff a jury.  The Second Circuit has repeatedly emphasized that "[w]here an employer acted with discriminatory intent, 'direct evidence of that intent will only rarely be available.'" *Gorzynski*, 596 F.3d at 101 (quoting *Holcomb*, 521 F.3d at 137).  The discriminator does not always announce his discriminatory intent.  The Court must carefully scrutinize the record for circumstantial evidence. *Id.*  Thus, even though Plaintiff has not adduced evidence of discriminatory comments by Nejasmic, his failure to provide a consistent answer for Plaintiff's firing can in these circumstances serve "as 'affirmative evidence of guilt,'" an inference which the Supreme Court has stated can be "quite persuasive." *Reeves*, 505 U.S. at 147–148 (quoting *Wright*, 505 U.S. at 296).  Moreover, "the same-actor inference is permissive, not mandatory," *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 24 (E.D.N.Y. 2015), and should not "become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand," *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999).  This is especially true given the Court's responsibility on a motion for summary judgment to "view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003).  There is evidence that Nejasmic had little previous experience with Chinese employees, Dkt. No. 37-4; Dkt. No. 37-8 at 16, and that Plaintiff's race and nationality may have caused friction with another managerial employee, Renosis, Dkt. No. 37-3 ¶ 11.  A jury reasonably could find that while Nejasmic might have been initially enamored of the concept of diversifying his workforce, he had second thoughts once confronted with the reality of it. *See Copeland*, 38

F. Supp. at 305 ("[I]t is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons."); *Douglas v. M. Swift & Sons, Inc.*, 371 F. Supp. 2d 137, 144–45 (D. Conn. 2005) (noting that when another employee refused to work with the plaintiff due to his race, this may have provided a motivation for the employer to fire the plaintiff for racial reasons, which would defeat the same-actor inference). "Evaluation of the merits of defendant's same actor argument . . . raises issues of fact and credibility that are the exclusive province of the jury." *Sklaver*, 2004 WL 1381264, at *10.

In short, this is not a case in which "the record conclusively reveal[s] some other, non-discriminatory reason for the employer's decision" or where the plaintiff has created "only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148; *see Chen*, 2022 WL 289317, *2; *Schnabel*, 232 F.3d at 88; *Grady*, 130 F.3d at 561. Rather, the decision-maker himself has provided conflicting explanations for Plaintiff's termination. *Compare* Rec. 2:15–2:35 *with* Dkt. No. 37-8 at 33–34, 53. There is no documentary evidence establishing the reasons for Plaintiff's firing or showing that he was informed of any of the problems mentioned by Nejasmic. Defendants' side of the story rests entirely on Nejasmic's statements, and those statements conflict. Because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," *Reeves*, 530 U.S. at 147, and Plaintiff also produces some circumstantial evidence that could support such an inference, the Court cannot say as a matter of law that Plaintiff's race or national origin was not "some part of the employer's motivation." *Bart*, 2024 WL 1281069, at *4 (quoting *Fields*, 115 F.3d at 120); *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("[W]hen all

legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration").

Defendants' motion for summary judgment is denied as to Plaintiff's claims of adverse action employment discrimination under Title VII and the NYSHRL. Because the NYCHRL is "more lenient toward plaintiffs than its federal and state equivalents," Defendant's motion is also denied as to the same claims under the NYCHRL. *Dillon v. Ned Mgmt., Inc*., 85 F. Supp. 3d 639, 654 (E.D.N.Y. 2015).

## II.    Claims of Hostile Work Environment

Plaintiff also brings claims for hostile work environment under Title VII, the NYSHRL, and the NYCHRL. *See* AC ¶¶ 31–34, 43–44.

### A.    Title VII Claims

To establish a hostile work environment claim under Title VII, the plaintiff must establish that the "defendant's conduct: (1) was objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic." *Sherman v. Fivesky LLC*, 2020 WL 2136227, at *5 (S.D.N.Y. 2020) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). The workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Banks v. Gen. Motors*, *LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (quoting *Cruz v. Coach Stores, Inc*., 202 F.3d 560, 570 (2d Cir. 2000)). The analysis depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance." *Banks*, 81 F.4th at 261 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[T]he misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387 (2d Cir. 2020).

Here, Plaintiff suggests that a hostile work environment existed because he heard racist comments, "witnessed cruel pantomimes about terminated workers," and was sabotaged via delays of materials and "intentional blockages in communication." Dkt. No. 37 at 18–19. The evidence produced to support these claims is not sufficient to show a hostile work environment under Title VII. Defendants are entitled to summary judgment because no reasonable jury could find that Plaintiff was subject to an objectively hostile work environment.

Plaintiff provides no evidence that supplies and labor were withheld, merely stating conclusorily in his declaration that "[m]y supervisors frequently and intentionally delayed and withheld supplies and labor." Dkt. No. 37-3 ¶ 10. Plaintiff also did not ascribe the reason the materials were not provided to his race or ethnicity. Dkt. No. 37-10 at 31–32. Similarly, while Plaintiff testified that Renosis excluded him from communication with the architect on the project, Dkt. No. 37-10 at 15–17, there is no evidence that this was due to his race or nationality. Nejasmic testified that it was standard procedure to ease new hires into the project until he is sure that they are capable, and stated the same thing in his recorded conversation with Plaintiff. Dkt. No. 37-8 at 50–52; Rec. at 38:10–39:30. "[M]any bosses are harsh, unjust, and rude," but to support a hostile work environment there must be "a linkage or correlation to the claimed ground of discrimination." *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002). These issues may have been harmful to Plaintiff, but there is no evidence they were discriminatory.

This leaves Plaintiff's allegations of racist remarks. As discussed above, two of the alleged remarks were about Asian or Chinese employees: Renosis's comment about the potential Chinese employee and Wojciech's comment related to Plaintiff by Juan. Dkt. No. 37 at 13–14. In addition, Plaintiff describes two incidents of mocking: one in which Nejasmic mocked the way a Black employee, Jaycon, chewed his food, Dkt. No. 37-3 ¶ 8, and one in which Renosis mocked the way an employee named Cesar walked with a limp, Dkt. No. 37-3 ¶ 7. Plaintiff also states that the N-word was used, Dkt. No. 37-10 at 24–25, but he did not identify who used it, when, or to whom. His testimony was entirely vague and conclusory. *See Great Am. Ins. Co.*, 607 F.3d at 292 (party may not "rely on conclusory allegations" on a motion for summary judgment (quoting *Scotto*, 143 F.3d at 114)). Plaintiff did not recall any other racial slurs, comments, or jokes being made at AIK. Dkt. No. 37-10 at 27.

Most of the incidents mentioned by Plaintiff do little to support a conclusion that the environment was objectively hostile to Plaintiff or that Plaintiff perceived it as hostile. As discussed *supra*, Plaintiff's testimony that Juan told him that Wojciech had made a statement about Chinese people to Juan is inadmissible hearsay if offered for the proposition that Wojciech in fact made the statement.[15] *See Gerzhgorin*, 2023 WL 2469824, at *2. The mocking incidents have "limited probative value" as to whether the work environment was hostile to Plaintiff "on the basis" of his race or nationality, *Cruz*, 202 F.3d at 571, both because they are isolated and because they are directed at individuals of a different race and nationality, *Schwapp v. Town of*

---

[15] The testimony could potentially be offered to show Plaintiff's perception of the workplace. *Cf. Banks*, 81 F.4th at 267 ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment" (quoting *Schwapp*, 118 F.3d at 111)). However, even assuming Plaintiff perceived the environment as hostile, his claim would fail because he has not produced evidence to show it was objectively hostile. *Rasmy*, 952 F.3d at 387.

*Avon*, 118 F.3d 106, 112 (2d Cir. 1997); *Sherman*, 2020 WL 2136227, at *10–11;  *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 515 (S.D.N.Y. 2010) (Lynch, J., sitting by designation).[16]

The statement by Renosis, "[w]ho f***ing can compete with the f***ing Chinese?," was made in Plaintiff's presence and directed at Chinese individuals.  Although it can be regarded as expressing the view that Chinese individuals are hard workers, in the context of Renosis allegedly refusing to interview a Chinese potential employee it could also be understood by a reasonable jury to convey the view that Chinese employees are not welcome in the workforce.  However, the comment is insufficient to create a hostile work environment.   Plaintiff does not recall hearing Renosis, or anyone at AIK, make any other statements about persons of Chinese national origin.  Dkt. No. 34-2 at 32–33.  For a single incident to create a hostile work environment under Title VII or the NYCHRL, it must be "extraordinarily severe."  *Banks*, 81 F.4th at 262 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  This is not such an incident.  Nor does considering Renosis's statement together with one other arguably racial mocking incident and a hearsay comment add up to environment that is "objectively hostile or abusive."  *Rasmy*, 952 F.3d at 387.  Plaintiff's hostile work environment claims under Title VII must be dismissed.

---

[16] In some cases, "[r]emarks targeting members of other minorities . . . may contribute to the overall hostility of the working environment for a minority employee." *Cruz*, 202 F.3d at 570. Although an atmosphere of such remarks can "exacerbate[] the effect" of harassment an employee experiences individually, *id.* at 571, the two incidents cited here are not facially race-based and do not, alone or combined with the statement by Renosis discussed below, approach the standard of being "sufficiently severe or pervasive to alter the conditions of the victim's employment," *id.* at 570.

### B.    NYSHRL and NYCHRL Claims

NYSHRL claims were traditionally analyzed under the Title VII standard.    *Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023).  However, the NYSHRL was amended in 2019 to "be construed remedially for the accomplishment of the remedial purposes thereof," language reminiscent of the construction provision of the NYCHRL. *Compare* N.Y. Exec. Law § 300 *with* N.Y.C.R.R. § 8-130.  Since that time, courts in this Circuit "have interpreted the amendment as rendering the standard for claims closer to the standard of the NYCHRL."  *Cooper*, 2023 WL 3882977, at *3 (quoting *Kaye v. N.Y.C. Health & Hosps. Corp.*, 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023)).  New York courts have used precedent under the NYCHRL when analyzing the post-amendment NYSHRL.  *See Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024); *Hunold v. City of New York*, 216 N.Y.S.3d 550 (Table), at *5 n.4 (N.Y. Sup. Ct. 2024).  The Court therefore analyzes Plaintiff's NYSHRL claims together with the NYCHRL claims.

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  The NYCHRL "does not differentiate between [hostile work environment] and discrimination claims."  *Milord-Francois v. New York State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 330 (S.D.N.Y. 2022).  Therefore, the standard for hostile work environment is the same as it is for other discrimination claims: whether the plaintiff "was treated 'less well than other employees' because of the relevant characteristic.  *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 245 (2d Dep't 2021).  "The NYCHRL imposes liability for harassing conduct that does not qualify as 'severe or pervasive,' and 'questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability.'" *Espinosa v. Weill Cornell Med. Coll.*, 2021 WL 1062592,

at *9 (S.D.N.Y. Mar. 19, 2021) (quoting *Williams v. N.Y.C.H.A.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009).  Rather, "liability is normally determined simply by the existence of differential treatment." *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 38). It was the intent of the New York City Council "to make sure that discrimination plays *no* role," rather than only a moderate role, in the workplace. *Williams*, 872 N.Y.S.2d at 38.

Under the NYCHRL, the conduct at issue must be "caused by a discriminatory motive; 'it is not enough that a plaintiff has an overbearing or obnoxious boss.'" *Dillon*, 85 F. Supp. 3d at 657 (quoting *Mihalik*, 715 F.3d at 110).  And even when the conduct is discriminatory, it is an affirmative defense to liability that "the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Mihalik*, 715 F.3d at 111 (quoting *Williams*, 872 N.Y.S.2d at 41 (internal quotation marks omitted)).  However, the plaintiff need not show an environment that is "permeated with discriminatory intimidation, ridicule, and insult." *Banks*, 81 F.4th at 261 (quoting *Cruz*, 202 F.3d at 570).  Forcing an targeted employee to suffer unwanted conduct based on a targeted characteristic is understood in and of itself to "impose[] a different term or condition of employment" on the employee. *Mihalik*, 715 F.3d at 110.

Because the NYCHRL has no frequency requirement, "even a single comment may be actionable in the proper context." *Mihalik*, 715 F.3d at 113.  A comment which, for example, "signal[s] views about the role of [a protected group] in the workplace" might be reasonably regarded as more than a "petty slight or trivial inconvenience." *Williams*, 872 N.Y.S.2d at 41 & n.30.  "[S]ummary judgment still can be an appropriate mechanism for resolving NYCHRL claims" and "courts may still dismiss 'truly insubstantial cases,' where the defense is clear as a matter of law." *Mihalik*, 715 F.3d at 111.

The NYCHRL standard does not change the fact that the mimicking incidents mentioned by Plaintiff were stray remarks not directed at Plaintiff's protected class. These remarks would not lead a reasonable fact-finder to conclude that Plaintiff was treated "less well" in the workplace on the basis of his race or national origin. *Bilitch*, 148 N.Y.S.3d at 245.

However, a jury which credited Plaintiff's account of his interactions with Renosis regarding the prospective Chinese employee could reasonably find that Plaintiff was treated "less well" in the workplace because he was Chinese. Although the record is not clear whether Renosis was Plaintiff's supervisor in a technical sense, Renosis was senior to Plaintiff and there is evidence he was charged by Nejasmic to supervise his work. Dkt. No. 37-3 ¶ 2; Dkt. No. 37-8 at 17-18, 21. According to Plaintiff, when Plaintiff brought in a Chinese employee to interview with Renosis, Renosis kept Plaintiff and the employee waiting for an hour and a half. Dkt. No. 37-3 ¶ 11. When Plaintiff prompted Renosis to interview him, Renosis stated "[w]ho f***ing can compete with the f***ing Chinese?" and refused to interview the employee. *Id.* Renosis's statement, combined with his alleged action of refusing to interview the employee, can be inferred to express the view that Chinese employees are not welcome at AIK. A jury could reasonably infer that if Plaintiff had been of a different nationality and had brought a compatriot to interview, Renosis would have interviewed the employee and done so promptly, without wait. Implying to Plaintiff that he is not welcome because of his race and refusing to interview his referral because of Plaintiff's race and that of his referral constitutes differential treatment. This creates a dispute of material fact as to whether liability exists under the NYCHRL.

Renosis's alleged actions are not the type of "truly insubstantial" conduct that any reasonable factfinder would consider a "petty slight or trivial inconvenience." *Williams*, 872 N.Y.S.2d at 41. Courts have sometimes found remarks to be insubstantial when they are "not

facially racially derogatory." *Golston-Green*, 123 N.Y.S.3d at 669, 671 (supervisor stated he wouldn't "hold the plaintiff's hand and sing 'Kum Ba Yah'"); *see Milord-Francois*, 635 F. Supp. 3d at 329 (supervisor "questioned Plaintiff on why she looked angry" and commented on her "fucking scowl face"). Remarks may also be insubstantial if they can easily be brushed off as "petty" and inconsequential. *Gittens-Bridges v. City of New York*, WL 8825342, at \*2 (2d Cir. Dec. 21, 2023) (supervisor referred to plaintiff as "old school secretary without computer skills" and "mommy"); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017) (summary order) (colleagues made isolated race-based and sexual-orientation-based insults as part of general animosity between them and Plaintiff).

But here the remark is facially racial. Though it can be construed as complimentary, in the context of Renosis's refusal to interview the employee it expresses a negative attitude towards Chinese workers; one that, in Plaintiff's telling, Renosis immediately acted upon by failing to interview a prospective employee. Renosis's conduct "signal[s] views about the role of [Chinese people] in the workplace," putting it in a category that courts have suggested is actionable. *See Mihalik*, 715 F.3d at 113 (quoting *Williams*, 872 N.Y.S.2d at 41 n. 30). Courts have held that similar comments directly expressing discriminatory animus, even if not frequent or pervasive, create a triable issue of fact under the NYCHRL. *See Karupaiyan v. CVS Health Corp.*, 2023 WL 5713714, at \*20, 25 (S.D.N.Y. Sept. 5, 2023) (supervisor's referred to plaintiff as a "black apple" and "old black Madrasi"); *Golston-Green*, 123 N.Y.3d at 671 (supervisor stated that he "did not like women on this job because they have babies"); *DeLuca v. Sirius XM Radio, Inc.*, 2017 WL 3671038, at \*21 (S.D.N.Y. Aug. 7, 2017) (supervisor called plaintiff a "dyke" and her work "gay").

Summary judgment cannot be granted for Defendants on Plaintiff's claims under the NYSHRL and NYCHRL.

## III.    Individual Liability

Defendants argue that even if Plaintiff's claims survive as a general matter, Nejasmic cannot be held individually liable under the NYSHRL and Renosis cannot be individually liable under the NYSHRL or NYCHRL.  Dkt. No. 36 at 14–15.

Under the NYSHRL, an individual defendant may be held liable "only on an aider-and-abettor theory."  *Baptiste v. C.U.N.Y.*, 680 F. Supp. 3d 415, 427 (S.D.N.Y. 2023); *see Doe v. Bloomberg, L.P.*, 167 N.E.3d 454, 455–56 (N.Y. 2021) (clarifying previous decisions which had been taken to suggest that an individual in a supervisory role could be held liable as an "employer"); N.Y. Exec. Law § 296(6).  Defendant does not plead aiding-and-abetting liability or argue that either individual aided or abetted discrimination by another. *See* AC ¶¶ 42, 44; *Hardwick v. Auriemma*, 983 N.Y.S.2d 509, 513 (1st Dep't 2014) ("[A]n individual cannot aid and abet his or her own violation of the Human Rights Law.").  Therefore, summary judgment is granted for the Individual Defendants under the NYSHRL.  *See Jackson v. Federal Express*, 766 F.3d 189, 197–98 (2d Cir. 2014).

Under the NYCHRL, an individual defendant may be held liable when the individual has "some supervisory role over the victim of their discrimination."  *Russell v. N.Y. Univ.*, 2024 WL 1773218, at *6 (N.Y. Apr. 25, 2024).  Given that the statute is "construed broadly" to cover "those who wield any ability to dictate or administer the compensation, terms, conditions, or privileges of the plaintiff's employment," it cannot be said on this record that Renosis had no supervisory authority over Plaintiff.  *Id.*  Plaintiff states that he worked under Renosis's supervision.  Dkt. No. 37-3 ¶ 2.  There is evidence that Plaintiff had to go through Renosis to communicate with the architect, Dkt. No. 37-8 at 50–52, and order materials, Dkt. Nos. 37-7; 37-

9 at 16–20, and that Nejasmic used more senior employees such as Renosis to keep an eye on new employees, Dkt. No. 37-8 at 17–18, 21.  Summary judgment cannot be granted for Renosis on the issue of liability under the NYCHRL.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is granted as to count two of the amended complaint and as to the Individual Defendants' liability under the NYSHRL.  The motion is denied as to counts one, four, and five of the amended complaint.

The Clerk of Court is respectfully directed to close Dkt. No. 32.

SO ORDERED.

Dated: October 8, 2024
       New York, New York                        _____
                                                         LEWIS J. LIMAN
                                                 United States District Judge